ASA JOHNSTON, PLAINTIFF IN ERROR, VS. BENJAMIN D. WRIGHT, EXECUTOR OF C. P. KNAPP, DECEASED.

1. Where the title is in the vendor of personal property, and upon a sale the vendee agrees to stand between the vendor and *all damages between* him and the United States Government which may thereafter occur, and at the time of the sale the authority of the United States is being actually exercised by the army of the United States, in military occupation of the district, the amount of the purchase money paid under a claim of right by the United States to an officer of the army of the United States by the vendor, after protest and imprisonment and notice to the vendee, held to be within the true meaning of the terms "all damages" under the peculiar circumstances of this case.

Writ of Error to Escambia Circuit Court.

Asa Johnston vs. Benjamin D. Wright, Executor, &c.—Declaration.

This was an action of assumpsit instituted by the plaintiff in error against the defendant in error.

There was judgment sustaining a demurrer to the declaration, which declaration was in the words and figures following:

The said plaintiff, by his attorney, C. W. Jones, complains against said Benjamin D. Wright, executor of the last will and testament of Chester P. Knapp, deceased, in an action upon promises. For that whereas heretofore, to wit, on the —— day of —————— A. D. 1862, the said plaintiff agreed to deliver to the persons exercising powers of government in the late Confederate States, that is to say, to the late Confederate States Government, twenty-five bales of cotton when requested and required by the said authorities, and in consideration of certain printed obligations of the denomination of five hundred dollars, issued and put into circulation by the persons exercising the powers of government in the late Confederate States, delivered by them to said plaintiff. And the plaintiff avers that the said printed obligations delivered to him as aforesaid, were what was popularly called Confederate States eight per cent. bonds, and were to become due and payable at the city of Richmond, in the State of Virginia, on the first day of July, A. D. 1868. And the said plaintiff further avers, that the aforesaid twenty-five bales of cotton which he agreed to deliver as aforesaid, were his own rightful property, and was raised and cultivated by him. And the said plaintiff further avers, that *from the time of the agreement above-mentioned in relation to said cotton, up to the time of the sale and delivery thereof to the said Knapp in his lifetime, hereinafter mentioned, the said cotton was never demanded by the said Confederate Government, but remained in the possession of the plaintiff as his property,* until the 16th day of October, A. D. 1865. And the said plaintiff further avers, that on the 16th day of October, 1865, and after the overthrow and dissolution of the government of the said Confederate States by the public forces of the United States, and when the said printed obligations or bonds delivered as aforesaid to the plain-

tiff were utterly worthless and of no value in the hands of the said plaintiff, by reason of the overthrow of the said government of the Confederate States, the *said plaintiff, considering himself still the rightful owner of the said cotton*, and believing he had a legal right to sell and dispose of the same, at the special instance and request of the said Chester P. Knapp, in his lifetime, to wit, on the —— day of ——— and year aforesaid, did then and there bargain and sell unto the said Knapp all his right and title in and to the said cotton, and delivered the same to him in consideration of the reduced price of twenty-three cents per pound in gold coin, and the execution and delivery by the said Knapp to the plaintiff of a certain instrument of guarantee or indemnity in the words and figures following, to wit:

"Received of Asa Johnston twenty-five bales of cotton, at twenty-three cents per pound, to be weighed at Castleberry's Station, and a draft given for the same on LeBaron & Son, Mobile, and I agree to stand between the said Asa Johnston and all damages which may hereafter occur between the said Johnston and the United States Government.

"October 16, 1865.                    C. P. KNAPP."

"Mr. Knapp agrees to pay for the cotton above stated in gold.    Dated as above.                    C. P. KNAPP."

And the said plaintiff further avers, that at the time of the execution and delivery of the above-stated instrument of writing as set forth, and at the time of the sale of said cotton as aforesaid, the said Chester P. Knapp, in his lifetime, was fully informed as to the subscription of the said cotton to the late Confederate government, and equally apprised and informed as to the nature and character of the plaintiff's right and title in and to said cotton, and being so informed, then and there, in consideration of the sale and delivery of the said cotton as aforesaid, he, the said Chester P. Knapp, in his lifetime, agreed to and with the plaintiff as above set forth in the said written agreement, to stand between the plaintiff and all damages which might

afterwards occur between the said plaintiff and the government of the United States, meaning thereby that he, the said Chester P. Knapp, in his lifetime, would discharge, pay off, and save the plaintiff harmless from the payment of any claims or demands of any kind whatsoever which the said government of the United States might afterwards bring against or compel the said plaintiff to pay by reason of any claim or interest, real or pretended, valid or invalid, on the part of the said government of the United States in and to the said cotton, or any other damages or expenses which might result to or be paid by the said plaintiff in any manner connected with the prosecution of any such claims on the part of the said United States government against the said plaintiff, to the end that the said plaintiff might be secured in the firm possession of, and hold at all events, and without liability to the said United States, the sum of money paid by the said Chester P. Knapp in his lifetime to the said plaintiff for the aforesaid twenty-five bales of cotton, to wit, the sum of three thousand two hundred and eighty dollars in gold coin.

And the plaintiff avers, that on the said sixteenth day of October, 1865, martial law by authority of the President of the United States was in force and operative throughout the State of Alabama, where said agreement was made; that Major-General Charles R. Woods, the Department Commander of the forces of the United States within the said State of Alabama, was invested with full power and authority under and by virtue of the said law martial and the direction of the President of the United States, to enforce all rights and claims or demands, and take cognizance of all controversies wherein such were involved; that afterwards, to wit, on the 24th day of March, 1866, and since the death of the said Chester P. Knapp, the said plaintiff, by order of the said Major-General Charles R. Woods, was taken to the city of Mobile in said State of Alabama as prisoner, and held there for the space of one week by the authority aforesaid, and was then and there compelled by the said authority, under severe penalties, to pay over to the said General Charles R.

Woods the sum of three thousand two hundred and eighty dollars in gold coin for and on account of the said twenty-five bales of cotton sold as aforesaid to the said Chester P. Knapp in his lifetime. And the plaintiff avers, that before the payment of the said sum of money, and after the said sum of money had been demanded from him by the officers representing the government of the United States, the said defendant was notified by the said plaintiff of such demand, and requested to stand between the said plaintiff and the damages with which he was threatened; but the said defendant, as executor as aforesaid, refused so to do, and said plaintiff was compelled to pay said amount of money or remain a prisoner, which amount he did pay under proper protest.

The declaration then lays damages at five thousand dollars, and ends with the usual conclusion.

The demurrer interposed "assigns for causes the following:"

First. That the contract set forth in the plaintiff's declaration was null and void because its object and intent was to fraudulently deprive the United States of their property in and to the twenty-five bales of cotton in the declaration mentioned.

Second. That the declaration shows no damages incurred by the plaintiff which was intended to be covered by the writing of indemnity of the said testator, as set forth in the plaintiff's declaration.

This demurrer is sustained; there is judgment for defendant, and the plaintiff prosecutes a writ of error from this court, and assigns as error, "That the court erred in sustaining the demurrer filed in this case to the plaintiff's declaration."

*Campbell & Perry* for the demurrer.

The facts as presented by the declaration are, substantially, that the plaintiff sold to the so-called Confederate States twenty-five bales of cotton, for which he was paid in eight per cent. bonds, the cotton remaining in his possession subject to the order of the so-called Confederate Government up to the time

of its overthrow. After the fall of that government, the plaintiff sold the cotton to defendant's testator for $3287 in gold, which was paid by testator, who also executed to plaintiff a writing of indemnity whereby he agreed "to stand between the said Johnston and all damages which may hereafter accrue between the said Johnston and the United States Government."

After the fall of the Confederacy-the United States claimed the cotton, or rather the money for which it was sold, and which, under a threat of imprisonment, the plaintiff paid over to them.

These facts sustain the following propositions, which are the special grounds assigned in the demurrer:

1. That the contract set forth in the declaration was illegal and void, because it originated in a design to defraud the United States.

2. The declaration shows no damage covered by the indemnity to have been incurred by the plaintiff.

The truth of these propositions depends upon the question whether the United States had an interest in the cotton at the time of its sale by the plaintiff to testator.

The various aspects in which the so-called Confederate States have been viewed by the United States, as their interests or policy might dictate, are matters so connected with the history of the day, so notorious and interesting to all, that courts of justice are bound to recognize and act upon them.

Ever since the fall of the so-called Confederate Government, the United States have treated the States which composed it in some respects as conquered territory. They have recognized that government as having been capable of acquiring property; and have constantly asserted themselves to be the successors of all the proprietary rights 'of that government. This has been the uniform action within the States where seizure has followed the discovery of Confederate property of every description. The same right is being asserted even in foreign countries, as is shown by the case of Prioleau and others in the High Court of

Chancery in England. This action of the political department of the government is even virtually admitted by the plaintiff's declaration, and the action of that department is conclusive upon all courts within the limits of the United States.

The Supreme Court of the United States, in Foster & Elam vs. Neilson, 2 Peters, 253, declared that the action of the political department of the government was binding on the court. The same doctrine has been recently asserted by the same court in the cases of the States of Georgia and Mississippi vs. Secretary Stanton and others.

But there is another aspect of this question, which is equally conclusive, under the laws of nations. Are we a conquered people? If so, the conqueror succeeded to all the rights and property of the conquered government or association. Wheat. Law of Nations, 395-6, 408.

Was the cotton in question the property of the so-called Confederate States at the time of their conquest by the United States? The declaration shows it was sold by the plaintiff to the Confederate States, and paid for in eight per cent. bonds. It is a notorious fact that in all such cases the vendor became and held the cotton as the bailee, and subject to the order of the Confederate Government. But it is alleged that, the bonds having become worthless by the overthrow of the Confederate Government, the plaintiff was re-invested with the title to, or acquired a lien upon the cotton for the purchase money. If, upon the fall of the Confederate Government, the title to the cotton vested in the United States, it certainly could not also return to the plaintiff. No lien existed as between the Confederate Government and the plaintiff. Their contract was completely executed; the possession retained by the plaintiff having been purely that of a bailee without interest and for the accommodation of that government. No lien was created by the conquest of the Confederate Government. The United States acquired the property as the Confederate States enjoyed it.

It was and still is the settled and declared policy of the Uni-

ted States to wipe out forever the force and effect, and even the recollection of Confederate securities. They were made valueless in the hands of the holder as a punishment for the aid and comfort given to the rebellion by the act of receiving them. What, therefore, was intended as a penalty cannot be made to operate as a great benefit to the citizens of the so-called Confederate States, even, as in this case, at the expense of the United States.

But if the right of property was in the United States, it would not avail the defendant, even if he could show that he had a claim upon the cotton for the original purchase money; and that, in any view of the case, must be the full extent of his claim, if any. He bargained for the sale of *the cotton*, and not merely his interest in it; he bargained for and connived at its removal; he was a bailee, and yet, without notice to his principal, he contracted solely for his own advantage, at the expense of the rights and interests of his principal; and lastly, to shield himself from the consequences which he anticipated from his wrong, he takes the writing of indemnity from the testator. In any aspect of the case, therefore, the first proposition of the demurrer is fully sustained, to wit: 1st. That the contract set forth in the declaration was illegal and void, because it originated in a design to defraud the United States. Broom. Max., 178; Smith on Contracts, 65.

2d. The declaration shows no damage to have been incurred by the plaintiff which was intended to be covered by the indemnity.

The declaration is framed as though the testator was bound by his agreement to pay twice for the cotton. But the indemnity is susceptible of no such construction. It was intended to cover only such damages as the plaintiff might incur by the sale of the cotton to the testator. It was evidently founded on the hypothesis that the title to the cotton was in the United States. The declaration alleges the belief of plaintiff that he was the owner of the cotton; but is it fair to construe the testator's obligation entirely by the plaintiff's belief? It is evident the

testator acted upon the opposite opinion, and the acceptance of the indemnity, worded as it was, by the plaintiff, establishes his coincidence in that view. Hence, for any damage to the plaintiff incurred upon that hypothesis, the testator agreed to stand between the plaintiff and the United States. If the cotton was not the property of the United States, then no claim could be successfully asserted by them, and no damage could result to the plaintiff by their action. The testator certainly never contracted to indemnify the plaintiff for the lawless violence of any party who, without right, should wrest from him the proceeds of his cotton.

The plaintiff cannot maintain an action on the indemnity without admitting the title of the United States. There was only one contingency upon the occurrence of which a cause of action could arise upon the indemnity, to wit: in the event the United States had exacted more from plaintiff for the cotton than he actually received. But the United States exacted from plaintiff the exact sum, and no more, which he received from the testator for the cotton.

As to plaintiff's imprisonment, the fair deduction from the allegations of the declaration is, that he was imprisoned because of his refusal to pay over the money to the United States.

If the cotton was the property of the United States, the plaintiff incurred no damage. If the cotton was plaintiff's, the indemnity does not cover the damage incurred.

*C. W. Jones* against the demurrer.

It is contended for the plaintiff that the demurrer should be overruled:

Because it sufficiently appears that the cotton mentioned in the declaration was not in such a state or condition at the time of the sale thereof as made the transaction between Knapp and the plaintiff a fraud upon the rights of any one; 2d. That

the damages stated in the declaration, as contemplated and embraced by the contract, clearly cover and include the losses sustained by the plaintiff as shown by the pleadings.

We insist in this case that the cotton mentioned in the declaration was the rightful property of the plaintiff at the time of the sale to Knapp. The *obligation to deliver the cotton to the Confederate States* was purely executory on the part of the plaintiff; it was never consummated by a delivery; and even if the right of property had passed by the agreement, the *insolvency* and *bankruptcy* of the *Confederate States*, before the time *fixed* for the payment of the obligations, and while the property was still in the possession of the seller, *defeated* the *right* of the Confederate States, or any one claiming under them, to the possession of the goods. So far as this question is concerned, the Confederate States had no greater or higher rights under the law, than any corporation or individual would have had in a like case. Suppose the plaintiff had agreed, as stated in the declaration, to deliver this cotton to any corporation in the *State*—the Ala. and Fla. R. R. Co., for example—and had received the *bonds* of such corporation payable in July, 1868, for the same; suppose that in 1865 the said corporation became insolvent and bankrupt; that it was forced into bankruptcy, its franchises and privileges and property sold, and that its bonds in the hands of the seller of the cotton became valueless; and that at the *same time* he had possession of the cotton, which had not been demanded or *delivered*, who would have the right to demand or sue for the cotton in that case? Would the assignee of the bankrupt corporation have such a right? He would not. The *insolvency* and bankruptcy of the corporation, *before* the *bonds* were paid, would defeat the right of the assignee to the property, and the *seller*, in *virtue* of his *original ownership*, which would revive by way of "*post limine*," would have the right to hold the goods.

This was the opinion of the Court of King's Bench in the case of Bloxam et al., vs. Saxby, 4 Barnwell and Cress., 480, in a like

case. See Tooke vs. Holingsworth, 5 Term Repts., 215; Hanson vs. Meyer, 6 East., 614.

We insist therefore that the right of disposition of this property was in Mr. Johnston at the time of the sale to Knapp, and that where the *right* to sell exists, the exercise of that right cannot by any legal possibility be denied on the ground taken by the demurrer.

The government of the United States had no vested interest or right in this cotton. The most that could be claimed for her in that connection, is, that *she might, possibly*, have proceeded against the cotton by libel, under the confiscation law of 1861, and asked for its condemnation. But this was never done, and *until* the government had so proceeded, and procured a condemnation of the property under the law referred to, *the title* of the plaintiff to the cotton was perfect, for *under* this *law* of 1861, a *condemnation* is necessary in order to change the title, See the case of the brigantine Mars, 1st Gallison, 192; and the case of the Thomas Gibson, 8 Cranch; and the Supreme Court have held in a recent case, that proceeding under this law must be proceeded in, and determined by, the course of *the common law*. Foundry vs. U. S., 6 Wallace.

But we insist that the property in question was not subject to condemnation under the law of 1861; it was *never* out of the *possession* of the *plaintiff*, until he sold it to Knapp. It was never sold, because *a sale*, to be perfect, implies a delivery, *and* an *agreement to sell*, as stated in the *declaration*, cannot be made to *amount* to a *sale* by any fair construction. It was not lent or used by the Confederate Government, for *loan and use* imply possession by the party obtaining the one or the other.

Again, the confiscation law of 1861, as its own terms imply, was purely a war measure. Its object was to weaken the powers of the resisting forces, by *rendering* insecure the title to property that might be used or lent for the purpose of aiding the rebellion.

After the struggle terminated there was no longer any occa-

sion for the law, and the amnesty extended by the Executive of the United States to nearly the whole population, after the war, remitted the people to their rights, and prevented the operation of the law. See Foundry vs. United States, 6 Wallace.

Parties whose property had been confiscated and sold were refunded the value of the same by the Court of Claims, in many cases, since the termination of the war, and I am not aware of any proceedings against the property of citizens under this law, since the termination of the struggle, that were carried through the regular course; but all such were dismissed by the government, *although* the *seizures* had been made, and the proceedings began, prior to the late peace. I therefore insist that the government of the United States *had* no interest in this cotton, at the time of the sale to Knapp, which made the disposition thereof void upon the grounds stated in the demurrer.

If it is pretended that the United States had any title or claim to this property except what she derived from the law of 1861, upon what are they founded?

She must either rely on the law referred to, or assert title as succeeding to all the rights of the Confederate government. If the latter, then it must be *admitted*, in behalf of the government of the United States, that the contract between Johnston and the Confederate authorities was valid, and that the obligations given to the plaintiff by the said authorities constituted a *good* consideration for the same, and the United States would be thus absurdly, in my opinion, made to say that a *contract entered* into between a *citizen* and the person waging war against the United States, and in the furtherance thereof, is *valid*, and that the bonds issued by the persons in rebellion constituted a good and valuable consideration for the contract.

This view cannot, in my opinion, be sustained. The contract made with the Confederate authorities was void; no rights of property could or did pass by the same, and as the Confederate authorities acquired no rights under this contract, for the want of a legal consideration, the United States succeeded to or could

43

take no higher or better title or interest than was possessed by the persons to whose *rights she succeeded.*

The Executive and Legislative Departments of the government have held that the late war on the part of the South was a rebellion, and the judiciary will follow such decision. Rose vs. Himley, 8 Cranch.; 2 Peters, Foster et al. vs. Eslam. Mr. Johnston, at least, had as good a title to this property, as an alien, in case of a decent cast upon him of real estate, which he is not permitted to hold under the law. In such a case he can *hold against* all the world until an inquest of "office found" completes the escheat, and he may convey the estate and all his interest therein. Sheriff vs. O'Neil, 1 Mass.; Storer vs. Batsen, 8 Mass. 431; Fox vs. Southback, 143. Again, if Mr. Johnston had reason to believe that the circumstances constituting his title gave him the legal right to the property, the contract would be valid, although it turned out afterwards that he was mistaken in this respect. Levy on Contracts, 603; Stone vs. Hooker, 9 Conan, 154; Allair vs. Ousland, 2 John. Cases, 52. The defendant is estopped from impeaching his testator's contract on the ground stated. Knapp obtained the possession of the cotton by virtue of the agreement in this case. By *accepting* the *cotton under* the circumstances, he affirmed the right of the plaintiff to sell, for the declaration states clearly that he purchased it with a full knowledge of all the circumstances connected with the claim and title of Johnston. Had he been in ignorance as to this point, the case might be different; but with a full knowledge of all the facts in the case, he buys the cotton and makes the contract, and after he obtains all the benefit which he could possibly derive from the sale, with the proceeds of the property in his hands, he *then* turns around and *alleges* that *this his* own *agreement* is founded in fraud and is void. 1 Greenleaf's Ev., 289; 2 do., 352; 1 Eng. Law and Equity Repts., 339. We affirm that the contract in this case does cover and embrace the damages sustained by the plaintiff.

We state in effect that Knapp purchased this cotton with

full information as to its title and condition ; that he obtained it at a low rate, because he assumed *all* the risks of the transaction, stipulating, as he did, to take all the chances of government interference ; that the understanding of the parties was that Knapp should meet any demand that the government might make against Mr. Johnston for this cotton, and contest or pay off the same, to the end that Johnston might be secured in the *possession* of the *money* paid him by Knapp.

Now this is stated in the declaration, as to the understanding of the parties, as to the words *all damages* mentioned in the *agreement*, and the *plaintiff* had a right so to *plead* it, and the *demurrer* admits this construction to be true, and the plaintiff on the *trial* before a jury *would* have a right to show by *parol* or other proper proof, the intent of the parties in this respect when the terms of the writing are doubtful. Haltz vs. Wright, 16 Lev. and Rawle, 345 ; 1st Binn., 616 ; 17 Ala., 45 ; 20 do., 140. *All damages* mean every kind of damage, and the words must be taken most strongly against the party who stipulates. 1st Burrow, 199 ; Rives' Ala. Dig., 343.

WESTCOTT, J., delivered the opinion of the court :

The matters of law stated in the demurrer assume that the facts stated in the declaration disclose a case wherein the Confederate government had acquired title to the cotton by a sale from the plaintiff, and that he subsequently simply retained possession as a bailee, the title having passed. The argument upon this assumed case is, that the title having passed out of the plaintiff, the United States by the results of the contest had title, and that the transaction was a fraud. While the case has been argued here by the counsel for the demurrer upon the assumption that the case made in the declaration is one in which the title passed, it has been argued by the representative of the declaration in a contrary view. There may have been what was deemed to be under existing local regulations a sale and trans-

492  SUPREME COURT.

Asa Johnston vs. Benjamin D. Wright, Executor, &c.—Opinion of Court.

mutation of title by the plaintiff, but the declaration, given a fair construction, does not make that case, and if that case is sought to be made it should be raised by proper pleading.

While it is remarkable that persons would, in consideration of a simple naked contract *to deliver* twenty-five bales of cotton, pay what had at the time a substantial value for all purposes of local trade, with the understanding that the title remained with the party who received the value, yet such is the case stated. The plaintiff avers that the cotton was his property, even according to what was then the accepted law in the locality; avers that there was nothing more than a *contract to deliver*, and that it was neither in intent or effect a sale. If in fact, as alleged in the declaration, this was the property of the plaintiff, and there was no bad faith or misrepresentation, he has suffered a damage which comes within the meaning of the agreement under all the facts of the case as he represents it. If, however, he received in his dealings with the persons representing the existing local power, what was deemed at the time a compensation and consideration and payment, and a title passed to others, we do not perceive that he has suffered a damage within the meaning of the special agreement; and if title passed and a consideration was paid and accepted, subsequent insolvency of the vendee or worthlessness of the paper accepted by the vendor cannot divest the title or give the vendor in possession as a bailee a lien for the purchase money; but the declaration does not disclose the price. It may or not be true that plaintiff cannot be said to suffer any damage within the meaning of this agreement when he loses that which was not his own, and when his loss is the result of a recovery from him by the party entitled to it, if such was the case here, but we can only pass upon the case made by the declaration. The legitimate effect of this declaration is, that at the time of sale plaintiff represented to Knapp the facts to be as he describes them in the declaration. If he did not, his representations were untrue, and in this view he must fail.

The grounds of demurrer argued in this court are applicable

to a different state of facts, and if they represent the true state of the case the matter should be raised by other pleadings than a demurrer.

Let the judgment of the court upon the demurrer be reversed, and the case be remanded for further proceedings as the parties may be advised.